Hearing:
June 25, 1987
SDB

FOR PUBLICATION IN FULL

U. S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

In re Hayes Microcomputer Products, Inc.

———

Serial No. 472,926
Serial No. 472,927
Serial No. 472,928
Serial No. 510,199

———

Jones, Askew & Lunsford and Julius R. Lunsford, Jr. for applicant.

Frank Z. Hellwig, Trademark Examining Attorney, Law Office 3 (Myra K. Kurzbard, Managing Attorney).

———

Before Sams, Rice and Krugman, Members.

Opinion by Krugman, Member:


Applications have been filed by Hayes Microcomputer Products, Inc. to register SMARTMODEM 1200,[1] SMARTMODEM 1200B,[2] SMARTMODEM 300[3] and SMARTMODEM 2400[4] as trademarks for peripheral devices for computers, namely modems.

———

[1] Application Serial No. 472,926 filed March 29,1984.

[2] Application Serial No. 472,927 filed March 29, 1984.

[3] Application Serial No. 472,928, filed March 29, 1984.

[4] Application Serial No. 510,099 filed November 23, 1984.

Serial No. 472,926; Serial No. 472,927
Serial No. 472,928; Serial No. 510,099

In each instance, applicant seeks registration pursuant to the provisions of Section 2(f) of the Trademark Act based on a claim of acquired distinctiveness of the term SMARTMODEM.

Registration in each instance has been refused under Section 2(d) of the Trademark Act on the ground that applicant's marks so resemble the previously registered mark INTELLIGENT MODEM (MODEM disclaimed) for data processing and data communications equipment, namely, modems and automatic calling units[5] as to be likely, when applied to applicant's goods, to cause confusion, mistake or to deceive.

Registration has also been refused under Section 2(e)(1) of the Act on the ground that the term SMARTMODEM is a generic designation for the goods and that no amount of evidence could render the term distinctive for purposes of Section 2(f) of the Act. Alternatively, the Examining Attorney asserts that if the Board determines that the designation SMARTMODEM is not generic, the evidence of record is insufficient to demonstrate acquired distinctiveness of the term SMARTMODEM in view of its highly descriptive character.

Applicant has appealed the refusals of registration in each application. In view of the identity of issues presented by these appeals, the Board, in a ruling mailed June 14, 1986,

---

[5] Registration No. 1,261,505 issued December 20, 1983.

2

consolidated proceedings in these four cases. Accordingly, the Board will determine the issues presented in the four consolidated proceedings in a single opinion.

Turning first to the Section 2(d) issue of likelihood of confusion, it is clear that both applicant's goods and the goods recited in the cited registration comprise modems. Applicant concedes the identity of the products and the fact that the products of both parties are offered to the same purchasers. Applicant contends, however, that the goods marketed under the respective marks are relatively expensive and are sold to sophisticated consumers; that the common portion of the mark, that is, the term "MODEM," is the name of the goods; that the respective marks are all weak marks entitled to only a narrow scope of protection and that the marks as a whole are substantially different in sight, pronunciation and in the commercial impressions engendered so as to avoid any confusion as to source or sponsorship, when said marks are used in connection with identical goods.

The Examining Attorney, on the other hand, argues that the marks have the same meaning since "smart" and "intelligent" are synonymous terms in the computer field and that SMARTMODEM and INTELLIGENT MODEM both connote modems with significant computational ability. The Examining Attorney notes the numerical designations present in each of applicant's marks but

3

Serial No. 472,926; Serial No. 472,927
Serial No. 472,928; Serial No. 510,099

contends that these numbers have no source indicating function because they merely indicate the bits per second (baud) rates of the modems.

In our view, the marks involved herein are extremely weak and entitled to a narrow scope of protection. Applicant, by virtue of its seeking registrations pursuant to Section 2(f) of the Act, has conceded the merely descriptive character of the designation SMARTMODEM as applied to modems. While the INTELLIGENT MODEM registration was not issued pursuant to Section 2(f) of the Act, the weakness of said term cannot seriously be questioned.[6] While we agree with the Examining Attorney that the numerical designations in applicant's marks constitute subordinate matter and while we further agree with the Examining Attorney that the terms "smart" and "intelligent" have similar meanings when used in connection with computer equipment, specifically, modems, we think the similarity in meaning of the designations is insufficient to warrant a conclusion of likelihood of confusion where, as here, the

_____

[6] Indeed, as applicant and the Examining Attorney have noted, the Board held INTELLIGENT MODEM to be a merely descriptive designation for modems and sustained an opposition filed by applicant herein against the registrant's application to register said term. See: Hayes Microcomputer Prod. Inc. v. Business Computer Corp., 219 USPQ 634 (TTAB 1983). However, the parties had entered into a settlement agreement and stipulated that the opposition be dismissed. This stipulation was filed in the office but, unfortunately, was not associated with the file of the opposition proceeding until after the Board's decision was mailed. The Board's decision was subsequently vacated, the opposition dismissed and the INTELLIGENT MODEM mark thereafter issued into the registration cited against applicant herein. Regrettably, the Board was unable to recall its decision from the Bureau of National Affairs, to which said decision had been forwarded, in time to prevent is publication in the United States Patents Quarterly.

4

Serial No. 472,926; Serial No. 472,927
Serial No. 472,928; Serial No. 510,099

designations are extremely weak and are clearly distinguishable in appearance and pronunciation. See: Sunbeam Corporation v. Green Bay Tissue Mills, Inc., 199 USPQ 695 (TTAB 1978) and cases cited therein. Accordingly, we conclude that the Section 2(d) refusals in each case should be reversed.

We turn next to the refusal on the ground that none of applicant's marks are registrable pursuant to Section 2(f) of the Act for the reason that SMARTMODEM is a generic designation which cannot be registered regardless of any evidence of acquired distinctiveness or, in the alternative, that SMARTMODEM is such a highly descriptive designation that the Section 2(f) evidence of acquired distinctiveness is insufficient. In this regard, applicant has acknowledged that, when first adopted, the term "Smartmodem" had a "...descriptive significance in that it indicated that the goods were modems with enhanced features possessing what is generally referred to as 'intelligence' and decision making capability..."[7] Applicant claims, however, that the SMARTMODEM designation has acquired distinctiveness by virtue of applicant's large expenditures on advertising and promoting the SMARTMODEM

---

[7] Applicant's amendment and response filed March 18, 1985 (certificate of mailing dated March 14, 1985) in connection with each of the applications.

5

products, resulting in applicant's modems becoming very successful in the marketplace and the designation SMARTMODEM being widely recognized in the industry as indicating modems emanating from applicant. Applicant, in this regard, has submitted evidence that it has sold over $248 million of SMARTMODEM products and spent over $4 million in advertising products under the SMARTMODEM marks during the approximately four years the marks have been used. Applicant has provided a sample of its advertisements in various publications as well as articles from a number of publications referring to the SMARTMODEM designation in a trademark sense indicating products originating with applicant. Applicant has further introduced into the record a number of advertisements of third party competitors wherein proprietary rights in the SMARTMODEM term were attributed to applicant.

In addition to the foregoing, applicant has made of record a number of affidavits in support of its Section 2(f) showing. These include an affidavit from the president of a corporation owning a number of retail computer product franchises in Georgia, Louisiana and Mississippi, an affidavit from the president of a corporation involved in strategic marketing and communications for high tech industries and an affidavit from the president of a corporation which distributes microcomputer products. All these affiants state that they are

6

Serial No. 472,926; Serial No. 472,927
Serial No. 472,928; Serial No. 510,099

familiar with computer peripherals, specifically modems, and that they have come to recognize the term SMARTMODEM as indicating modems emanating from applicant.[8]

The Examining Attorney, in support of his position that the SMARTMODEM designations are unregistrable regardless of any evidence of secondary meaning, points to the computer dictionary definition of "smart" as a word meaning "having a significant amount of computational ability on its own (as opposed to dumb)...."[9] The Examining Attorney points to promotional material describing applicant's goods made of record herein by applicant and concludes that applicant's modems have a significant amount of computational ability and that these modems are "smart" as that term is understood in the computer field. The Examining Attorney points to the specimens of record in the SMARTMODEM 1200 application wherein the features of the goods are touted.. The advertising copy in the specimens states that applicant's modem "...answers calls,

_____

[8] Applicant, with its reply brief, attached a number of evidentiary exhibits comprising dictionary definitions, a copy of a prior unpublished Board decision (relating to the likelihood of confusion issue) and a photocopy of a page taken from the November 26, 1985 Official Gazette. While this evidence is untimely filed (See Trademark Rule 2.142(d)), dictionary excerpts are matters of which the Board can take judicial notice. Moreover, the Board is presumed to have knowledge of its prior decisions, unpublished as well as published. Accordingly, the material submitted with the reply brief is considered to be of record except for the Official Gazette excerpt which is excluded from consideration for being untimely submitted.

[9] Naiman, Computer Dictionary For Beginners.

7

selects transmission speed, transmits data and disconnects-automatically!  ...All the circuitry required for auto-answering and auto-dialing is built-in.  No auxiliary equipment is needed...."

The Examining Attorney has further introduced excerpts taken from the NEXIS research data base as evidence to support his position that "smart modem" is a common used term in the computer industry to generally refer to modems identical to or similar to applicant's modems.

Applicant has taken issue with the NEXIS excerpts submitted by the Examining Attorney, arguing that the Examining Attorney's NEXIS search was incomplete and misleading. Applicant has submitted its own assertedly more extensive and more accurate NEXIS search and concludes that the results show an extremely high percentage of usage of "smart modem" (two terms) and "smartmodem" (one term) in a trademark sense to refer to modems emanating from applicant.

Applicant has further taken issue with the Examining Attorney as to the Examining Attorney's characterizations of the features of applicant's modems, as touted in the specimens, as being "computational" and, therefore, "smart." Applicant contends that the enhanced features typically offered by modem manufacturers, including applicant, are automatic dialing,

8

automatic answering and automatic disconnect and that these features are not "computational" as that term is generally understood.

At the outset, we note that, in our opinion, the essential question to be decided is the generic or non-generic significance of the term "smart modem" as used in connection with modems. While applicant has combined these words into a single term, we agree with the Examining Attorney that if a term is unregistrable because of its generic character, even a misspelling of the term is insufficient to warrant registration of said term. See: Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 195 USPQ 281 (7th Cir. 1977), cert. denied, 434 U.S. 1025, 196 USPQ 592 (1978). Accordingly, we believe that if it is determined that the designation "smart modem" is unregistrable, the mere combining of the two words into one term is equally unregistrable. Moreover, we further believe that the the four different numeric designations in the designations sought to be registered are of no trademark significance and cannot serve to make the designations as a whole registrable if it is determined that "smart modem" is an unregistrable term. It is clear from the record that the numerical designations merely indicate the baud rate or the bits per second that can be processed by the modem. In this

9

regard, the record shows common usage of numerical designations by third parties in the modem field to indicate the bits per second rate that the modems can process.

Turning to the central question to be determined herein, namely, the generic or non-generic significance of "smart modem," the Examining Attorney, by way of excerpts taken from the NEXIS research system, has shown extensive use of "smart modem" in a common descriptive or generic manner in the computer field to identify modems having features identical or similar to those features possessed by applicant's products. The Examining Attorney has introduced some 88 NEXIS articles retrieved from searching "smart modem" (two words). The results of that search show use of the term with or without a hyphen in a generic or otherwise in a nontrademark manner in 68 of the 88 articles. Excerpts from some typical articles are noted as follows:

An April 21, 1986 article on modems appearing in InfoWorld states: "Modems are not all easy to determine the most important features for comparing competing models, The industry has smart modems and dumb ones, fast ones and slow ones, internal ones and external ones--the array of features and claims is bewildering and seemingly endless...."

10

Serial No. 472,926; Serial No. 472,927
Serial No. 472,928; Serial No. 510,099

A February 24, 1986 article in <u>Electronics</u> concerning a new type of "smart-modem filter" states that Exar Corporation's new filter "...mixes the analog and digital functions required to implement a 1,000-b/s smart modem with such features as call-progress monitoring, analog loop-back capability, phone-line status monitoring, and the ability to function over inferior telephone lines... The Exar 2129 filter offers modem designers the most commonly required smart-modem features."

A July, 1985 article in <u>Byte</u> concerning the "Anchor Automation Signalman Mark XII Modem" states that this manufacturer "...has made some design choices in deleting some of the Smart-modem's features, but most users will not notice the omissions." Under the heading "Features," the modem's features are set forth as follows: "Auto answer, auto-dial, smart modem (all functions commanded via data interface); low power consumption; two year warranty."

A July, 1985 article in <u>Data Communications</u> concerning current and emerging categories of intelligent user devices defines "smart modems" as follows: "In addition to allowing digital transmission along analog lines, these devices provide several automated features, such as autocall, autospeed detection, auto-answer, auto-log-on, and call validation...."

11

Serial No. 472,926; Serial No. 472,927
Serial No. 472,928; Serial No. 510,099

A December 10, 1984 article in Legal Times discusses the two types of modems as follows: "Two basic types of modems exist: smart modems and dumb modems. Smart modems provide a number of important additional functions that dumb modems do not, primarily automatic dialing and automatic answering...."

A letter appearing in the September 17, 1984 InfoWorld concerning a review of modems states: "When you reviewed three 1,200-baud 'smart' modems—the Apple Modem 1200, the PC Intellimodem, and the Popcom X100—1 was sorry not to see the Visionary 1200 mentioned... Compared to today's smart modems, the Visionary 1200 is a genius..."

A May 28, 1984 review of a new modem in InfoWorld states: "The Teleport 300 smart modem from Teltone allows you to enter data using a remote touch-tone telephone without a terminal."

Perhaps most interesting of all, a January 23, 1984 article in InfoWorld refers to a bulletin put out by applicant to its distributors and dealers announcing a patent agreement on a modem design between applicant and Bizcomp, a California corporation. As stated in the article, "...The announcement says that the Bizcomp patent covers 'any modems that have an escape or automatic-disengage sequence. These modem products are referred to in the industry generically as intelligent or smart modems.'"

12

Serial No. 472,926; Serial No. 472,927
Serial No. 472,928; Serial No. 510,099

In view of the NEXIS material submitted by the Examining Attorney of which the above noted articles are but a representative sample, we think the record amply supports the conclusion that "smart modem" is widely used in the computer industry as a generic or common descriptive name for modems having enhanced features. Applicant itself has admitted as much in its bulletin referred to in the January 23, 1984 InfoWorld article.

Applicant, while not commenting on any of the generic uses of "smart modem" made of record by the Examining Attorney, takes issue with the Examining Attorney's methodology in making the NEXIS search. Specifically, applicant complains that searches of "modem" and "smartmodem" (one term) should have been done in addition to the "smart modem" (two word) search done by the Examining Attorney. Applicant has performed and made of record the more extensive search and concludes that only a very small percentage of articles on modems were directed to "smart modem" or "smartmodem" and that the overwhelming majority of references to "smart modem" or "smartmodem" is as a trademark indicating applicant as the source of the goods. Applicant concludes that the failure of the Examining Attorney to search "modem" and "smartmodem" (one term) is misleading and that the high percentage of uses of "smartmodem" as a trademark is strong evidence of the acquired distinctiveness of the term.

13

Serial No. 472,926; Serial No. 472,927
Serial No. 472,928; Serial No. 510,099

It is clear that to determine genericness, one must determine whether members of the relevant public primarily use or understand the term to refer to the genus of goods. See: H. Marvin Ginn Corp. v. International Association of Fire Chiefs, Inc., 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986). Evidence of the public's understanding of the term may be obtained from any competent source, including newspapers, trade journals and other publications. See: In re Merrill, Lynch, Pierce, Fenner, and Smith, Inc., ___ F.2d ___, 4 USPQ2d 1141 (Fed. Cir. 1987), citing In re Northland Aluminum Products, 777 F.2d 1556, 1559, 227 USPQ 961, 963 (Fed. Cir. 1985); Dan Robbins & Associates, Inc. v. Questor Corp., 599 F.2d 1009, 1014, 202 USPQ 100, 105 (CCPA 1979); In re Thunderbird Products Corp., 406 F.2d 1389, 1390-91, 160 USPQ 730, 731-32 (CCPA 1969). As the Merrill, Lynch case makes clear, the Trademark Manual of Examining Procedure at section 1305.04 provides that the burden of proving genericness lies with the Office and the Examining Attorney must make such a showing based on clear evidence of generic use. We think the Examining Attorney has met this burden. The record shows a substantial number of publications using "smart modem" as a generic, common descriptive term for modems having enhanced features, the identical goods for which applicant seeks registration herein.

14

We disagree with applicant that the Examining Attorney's search of the NEXIS data base was incomplete and misleading. While applicant searched "smartmodem" (one term) and came up with 263 articles with 262 of the articles using the term in a trademark sense indicating applicant as the source, this is not surprising since there is no serious question that applicant alone has combined the words "smart modem" into a single term. Therefore, it is highly unlikely that any article combining the two words into one term would be referring to anything other than to the term as indicating applicant as the source of the goods. We further recognize from the record that applicant is a leader in the modem industry, with extensive advertising and promotion of its products and that applicant enjoys wide recognition in its field. Many articles refer to applicant and its products and it is quite likely that many stories referring to applicant would be retrieved in searching "smartmodem" (one term). The problem with this analysis, as touched on earlier in this opinion, is that the combining of a generic two word designation into one term does not alter the significance of that term and does not make it any less generic or any more registrable.

We find, therefore, that the Examining Attorney's search was neither incomplete nor misleading and serves to clearly

indicate that a significant portion of the computer industry views and uses "smart modem" as a generic term and that SMARTMODEM, either in a one word or two word format and either with or without any various numerical designations indicating baud rate or bits per second, is a generic term that is unregistrable. We concede that applicant has submitted a relatively substantial amount of evidence of de facto secondary meaning, especially when considering the relatively short period of time the four designations sought to be registered have been in use. Nevertheless, considering all the evidence and recognizing that the test in determining the genericness or common descriptive character of a designation is the primary significance of the designation to the relevant public, we find the primary significance of the term "smart modem" to the relevant public is as a generic or common descriptive term and we find that the combining of these words into a single term does not create a registrable mark.[10]

Decision: The refusals of registration under Section 2(d) of the Act are reversed. The refusals of registration under Section 2(e)(1) of the Act on the ground that the

---

[10] In the event it is ultimately determined that our decision herein is incorrect and that the designations sought to be registered are not generic, common descriptive designations, we find that the evidence of secondary meaning is sufficient to allow registration pursuant to Section 2(f) of the Act.

Serial No. 472,926; Serial No. 472,927
Serial No. 472,928; Serial No. 510,099

designations sought to be registered are generic or common
descriptive designations for the goods are affirmed.

J. D. Sams

J. E. Rice

G. D. Krugman
Members, Trademark
Trial and Appeal Board

DEC 4 1987

17